**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jim Kanelos, | No. CV-10-8099-PCT-GMS |
| Plaintiff, | **ORDER** |
| vs. | |
| County of Mohave, et al., | |
| Defendants. | |

Pending before the Court are Defendants' Motion for Summary Judgment (Doc. 86) and Plaintiff's Motion for Partial Summary Judgment (Doc. 88). For the reasons discussed below, Defendants' motion is granted in part and denied in part and Plaintiff's motion is granted in part and denied in part. Judgment is entered on all Plaintiff's claims.

## BACKGROUND

Plaintiff Jim Kanelos is a resident of Mohave County and a member of the Western States Constitutionalist Alliance ("WSCA"). The WSCA passes out literature several times a year in front of the Mohave County Administration Building (the "MCAB"), located in Kingman, Arizona. This literature typically includes a copy of the United States Constitution or Declaration of Independence and a leaflet about joining the WSCA.

On October 13, 2010, Plaintiff stood outside the MCAB's main entrance distributing literature to people entering and exiting the building. He was located about 25 to 30 feet from

the building's front doors.[1] As he passed out flyers, Plaintiff was approached by non-party Richard Weldon, County Risk Manager, and Defendant Bill Ekstrom, Deputy County Attorney. Weldon and Ekstrom told Plaintiff he was prohibited from passing out literature at the building pursuant to Administrative Procedures (3-1): Administration Building & Facilities Rules and Policies ("AP 3-1"). Plaintiff immediately stopped distributing literature.

AP 3-1 was drafted by Defendant Ron Walker, the Mohave County Manager, with the assistance of the County's civil attorneys. On March 1, 2010, Walker signed AP 3-1, thereby enacting it. Plaintiff opposes the following provisions in AP 3-1:

> **PROHIBITED ACTIVITIES:** No part of the Administration Building and Facilities may be used for the following purposes.
>
> 1. Political campaigning, including solicitation either in support of or against a political candidate, or potential political candidate, an issue before or potentially before the voters or an incumbent government official or employee. This provision does not prohibit the expression of personal opinions or beliefs if done in a manner that does not disrupt the business conducted within the premises.
>
> 2. Distribution of or gathering signatures on petitions including nomination, referendum or recall petitions.
>
> 3. Solicitation of campaign contributions.
>
> 4. The erection or display of campaign signs or banners. Provided that this provision will not prohibit a political sign of reasonable size attached to or painted on a vehicle, while the vehicle is parked on the premises for the legitimate conduct of government business. This provision will also not prohibit the wearing of campaign buttons or apparel in support of or against a candidate or issue while the wearer is on the premises for the conduct of legitimate government business.
>
> 5. Leafleting or distribution of material either in support of or against a candidate or an issue before the voters.
>
> 6. Political assembly, rallies, demonstrations or picketing.
>
> **No Solicitation:** No part of the Administration Building and Facilities may be used for the following purposes.

---

[1]The location where Plaintiff distributed fliers—about 25 to 30 feet from the front doors—has been established by both Plaintiff's unopposed statement of facts and Richard Weldon's deposition. (Doc. 89, ¶ 21; Doc. 89-1, Ex. 1 at 29). Defendant does not provide any evidence or argument to the contrary.

. . . .

2. Rallies, demonstrations, picketing or assembly, whether for political, commercial or personal purposes.

3. Solicitation of funds.

4. Leafleting or distribution of flyers or other literature.

(Doc. 87-1, Ex. F at 2). These provisions, in essence, prohibit five types of activities at the MCAB and on its grounds: 1) political campaigning, 2) distribution of petitions or leaflets, 3) solicitation of funds, 4) display of signs, and 5) rallies, demonstrations, picketing or assembly.

Defendants Tom Sockwell, Gary Watson, and Buster Johnson, who together constitute the Mohave County Board of Supervisors,[2] state that they "supported the implementation of" AP 3-1. (Doc. 64, ¶ 9). The Board did not, however, review AP 3-1 before its enactment, as the Board had delegated to Walker the authority to institute policies for the building without the Board's approval. (Doc. 87-1, Ex. F at 1; *Id.*, Ex. E at 26:22–27:10).

Prior to the enactment of AP 3-1, Ekstrom had advised both the prior County Manager and Walker to restrict certain expressive activities at County buildings. In 1990, Ekstrom wrote a letter advising the County Manager to prohibit political campaigning and political advertisements on the premises of the County's buildings to "avoid any appearance as a County . . . [of] supporting particular persons or issues." (Doc. 87, Ex. J). In 2006, the County moved its offices to the current building. In 2007, Ekstrom wrote a letter to Walker and other County officials stating that County buildings are not public forums and are to be strictly used for County business, and that individuals who "approach or harass" people conducting County business should be advised to "leave the premises and [take] their activity to [ ] traditional public forums." (*Id.*). Ekstrom contends that this practice of prohibiting political activities at County buildings is based on A.R.S. § 11-410 (2001), which states, in relevant part, that "[a] county shall not use its personnel, equipment, materials, buildings or other resources for the purpose of influencing the outcome of elections." (Doc. 87, Ex. C at

---

[2] The Board of Supervisors is the governing body of Mohave County.

1  25).

2      Plaintiff claims that prior to AP 3-1's enactment, he distributed literature at the

3  MCAB on multiple occasions without being told to leave. Plaintiff wishes to continue

4  distributing WSCA literature in front of the building, but states that he is prevented from

5  doing so by County officials' enforcement of AP 3-1. (Doc. 89, ¶ 35).

6      In his Amended Complaint, Plaintiff seeks a declaratory judgment from this Court

7  pursuant to 28 U.S.C. § 2201 (2010) that AP 3-1 violates his First Amendment rights. (Doc.

8  61, ¶¶ 35–38). Based on this alleged First Amendment violation, Plaintiff also brings claims

9  against the individual Defendants under 42 U.S.C. § 1983 for compensatory and nominal

10  damages. (*Id*. at ¶¶ 39–43). In addition, Plaintiff seeks punitive damages from defendants

11  Ekstrom, Sockwell, and Walker.

12      Defendants now move for summary judgment on all claims. (Doc. 86). Plaintiff,

13  meanwhile, moves for summary judgment on his declaratory relief claim. (Doc. 88). Oral

14  argument regarding these motions was held on August 10, 2012.

**DISCUSSION**

16  **I.   Legal Standard**

17      Summary judgment is appropriate if the evidence, viewed in the light most favorable

18  to the nonmoving party, demonstrates "that there is no genuine dispute as to any material fact

19  and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Substantive

20  law determines which facts are material and "[o]nly disputes over facts that might affect the

21  outcome of the suit under the governing law will properly preclude the entry of summary

22  judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "A fact issue is

23  genuine 'if the evidence is such that a reasonable jury could return a verdict for the

24  nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)

25  (quoting *Anderson,* 477 U.S. at 248). When the nonmoving party "bear[s] the burden of proof

26  at trial as to an element essential to its case, and that party fails to make a showing sufficient

27  to establish a genuine dispute of fact with respect to the existence of that element, then

28  summary judgment is appropriate." *Cal. Architectural Bldg. Prods., Inc. v. Franciscan*

1  *Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477
2  U.S. 317, 322–23 (1986)).

3  **II.     Analysis**

4  **A.     Section 1983 Claims against Smith, Johnson, Sockwell and Watson**

5  Plaintiff concedes that Defendant Smith is entitled to summary judgment on Plaintiff's
6  § 1983 claim against him in his individual capacity. (*See* Doc. 91 at 12 n.1) ("Plaintiff
7  requests the Court dismiss defendant Matt Smith."). For the reasons discussed below, the
8  Court will also grant summary judgment to Defendants Johnson, Sockwell, and Watson in
9  their individual capacities.

10  Plaintiff contends that Johnson, Sockwell, and Watson are subject to supervisory
11  liability under 42 U.S.C. § 1983. "Supervisory liability is imposed against a supervisory
12  official in his individual capacity." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir.
13  1991). An official is not automatically liable for the acts of those he supervises under the
14  theory of vicarious liability, but may incur liability where he "implement[s] a policy so
15  deficient that the policy 'itself is a repudiation of constitutional rights' and is 'the moving
16  force of the constitutional violation.'" *Redman v. County of San Diego*, 942 F.2d 1435,
17  1446–47 (9th Cir. 1991) (citing *Thompkins v. Belt*, 828 F.2d 298, 304 (5th Cir. 1987)).

18  Plaintiff has provided no evidence that Board members Johnson, Sockwell, or Watson
19  "implemented" or were the "moving force" behind AP 3-1. AP 3-1 was drafted and enacted
20  not by the Board, but by Ron Walker, the Mohave County Manager. (Doc. 87-1, Ex. F at 1;
21  Ex. E at 26:22–27:10). Because the Board has delegated policy-making authority regarding
22  County buildings to Walker, he had the authority to enact and implement AP 3-1 without the
23  Board's approval. *Id*. Plaintiff contends that the Board members are liable because they
24  "supported" the policy by not repealing it and by not removing Walker from his post as
25  County Manager. Without more, however, their passive support of AP 3-1 does not make the
26  Board members the "moving force" behind AP 3-1.

27  Plaintiff further contends that Supervisor Johnson "supported the Policy by stopping
28  the Zannas from distributing literature" at the MCAB. (Doc. 91 at 11). Gianluca Zanna and

Bridget Langston-Zanna are individuals who have filed a separate action in this Court. They allege in that action that in November 2009—prior to the enactment of AP 3-1—Johnson stopped them from handing out flyers inside the MCAB. Johnson could not, however, support a written policy that was not in existence at the time he is alleged to have supported it. Moreover, that Johnson may have stopped other individuals from handing out flyers does not make him the moving force behind the alleged infringements of *Plaintiff's* constitutional rights.

Lastly, Plaintiff argues that Sockwell "vociferously supported the Policy in [ ] articles" which he wrote to the newspaper. (Doc. 91 at 12). Although the articles may constitute evidence of Sockwell's support for AP 3-1, they do not show that he implemented the policy or was the moving force behind it. In short, Plaintiff has failed to create a genuine issue of fact that the Board members are subject to supervisory liability or any other form of § 1983 liability. Accordingly, they are entitled to judgment as a matter of law and will, along with Smith, be dismissed from this lawsuit in their individual capacities. *See Celotex*, 477 U.S. at 322 (stating that summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial").

## B.    Section 1983 Claim against Walker

Defendants contend that Plaintiff's § 1983 claim against Walker in his individual capacity fails as a matter of law because "the only conduct alleged against Mr. Walker (adopting the policy) occurred in his official capacity as County Manager." (Doc. 86 at 6). This argument mistakenly assumes that individual liability cannot attach to actions taken in one's official government capacity. In fact, suits against officials in their individual capacity generally do involve acts committed during the course of performing governmental functions. *See Hafer v. Melo*, 502 U.S. 21, 25  (1991) ("Personal-capacity suits . . . seek to impose individual liability upon a government officer for actions taken under color of state law.").

Defendants also claim that Plaintiff, in his Response, "has not contested, and thus concedes," that Walker is entitled to summary judgment. To the contrary, Plaintiff contends

in his response that "Walker is liable because he drafted and enacted the Policy that imposes a broad prohibition on public speech . . . that he knew or reasonably should have known the Policy would inflict constitutional injury on Mr. Kanelos." (Doc. 91 at 11) (citing *Harris v. Roderick,* 126 F.3d 1189, 1196 (9th Cir. 1997)). Plaintiff's claim against Walker in his individual capacity does not, therefore, fail as a matter of law, nor has he conceded this claim. The Court will not grant summary judgment in Walker's favor on this ground.

### C.   Plaintiff's Standing to Challenge AP 3-1

The "irreducible constitutional minimum of standing" requires that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and quotation marks omitted). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each ['injury in fact'] element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Id.* at 561.

As noted above, there are two leafleting provisions in AP 3-1. The first prohibits leafleting "either in support of or against a candidate or an issue before the voters." (Doc. 87-1, Ex. F at 2). The second is an absolute prohibition on all leafleting. (*Id.*). Plaintiff's leafleting activities on October 13, 2010[3] were clearly implicated by this second prohibition, and he therefore has standing to challenge it. Plaintiff's activities that day, however, were not implicated by the first leafleting provision, as the leaflets Plaintiff distributed on that day were not related to a particular candidate or issue before the voters.[4] Accordingly, Plaintiff

---

[3] Plaintiff's counsel stated at oral argument that Plaintiff is not making anything other than an as-applied challenge to the County's enforcement of AP 3-1 on October 13, 2010. (" THE COURT: All right. Are you making anything other than an as-applied challenge to the written policy? MS. ANCHORS: As applied to Mr. Kanelos *on that day*, yes, Your Honor, that is our claim, that it was -- that the policy is unconstitutional as applied to him engaging in his free speech rights *on that day*.") (emphasis added).

[4] These leaflets contained a copy of the Constitution and a leaflet about joining the WSCA. They did not advocate for or against particular issues or candidates. (Doc. 89-1, Ex.

1   has not shown actual or imminent injury from the first leafleting provision establishing his

2   standing to challenge it.

3        Nor has Plaintiff established actual or imminent injury from the remaining provisions

4   in AP 3-1.  Plaintiff notes that he would like to "solicit donations" in front of the building.

5   He does not, however, claim to have previously solicited donations at the building; nor does

6   he otherwise establish that the County's ban on solicitation places him in any danger of

7   imminent injury. Plaintiff further notes that he would like to engage in other "expressive

8   activities" at the building. Plaintiff does not particularize, however, which expressive

9   activities he would like to engage in, much less provide evidence that the remaining allegedly

10  unconstitutional provisions in AP 3-1 have caused actual or imminent injury to him.

11       For instance, Plaintiff raises both vagueness and strict scrutiny challenges to AP 3-1's

12  prohibition against "political campaigning."  This provision prohibits all "solicitation either

13  in support of or against . . . an issue before or potentially before the voters or an incumbent

14  government official or employee," except for "the expression of personal opinions or

15  beliefs." (Doc. 87-1, Ex. F at 2). Plaintiff does not contend, however, that on the day of the

16  challenged incident he solicited in support of or against political issues at the building. To

17  the contrary, Plaintiff states that  when he passed out fliers in front of the building he "merely

18  wished passersby a good morning, and asked if they would like a free copy of the

19  Constitution." (Doc. 89, ¶ 23). Wishing somebody a good morning or distributing a copy of

20  the Constitution does not constitute solicitation regarding "an issue before or potentially

21  before" the voters or government officials. Although AP 3-1's political campaigning

22  prohibition may be vague in regard to certain types of speech, Plaintiff has not shown that

23  the speech he engaged in at the MCAB is threatened by this prohibition. He therefore lacks

24  standing to challenge the political campaigning prohibition. *See Holder v. Humanitarian Law*

25  *Project*, 130 S. Ct. 2705, 2718–19 (2010) ("We consider whether a statute is vague *as*

26  *applied to the particular facts at issue*, for '[a] plaintiff who engages in some conduct that

27  _____

28  8, ¶ 6).

is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others.'") (emphasis added) (citing *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982)). Plaintiff has similarly failed to establish his standing to challenge AP 3-1's prohibitions on solicitation of funds, display of signs, rallies, demonstrations, picketing or assembly. The Court, therefore, will only address the constitutionality of the provision imposing an absolute prohibition on leafleting.

### D.    Forum Analysis

Even on government property, "[c]itizens are not entitled to exercise their First Amendment rights whenever and wherever they wish." *Kindt v. Santa Monica Rent Control Bd.*, 67 F.3d 266, 269 (9th Cir. 1995). "The Government, 'no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated.'" *U.S. v. Grace*, 461 U.S. 171, 178 (1983) (*citing Adderly v. Florida*, 385 U.S. 39, 47 (1966)). A court must perform "forum analysis to determine when a governmental entity, in regulating property in its charge, may place limitations on speech." *Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the Law v. Martinez*, 130 S. Ct. 2971, 2984 (2010). Where forum analysis is concerned, government property is sorted into four categories: "(1) a traditional public forum, (2) a designated public forum, (3) a limited public forum, or (4) a nonpublic forum." *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1134 (9th Cir. 2011). *See also Martinez*, 130 S. Ct. at 2984 n.11; *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 677 (1998). Plaintiff contends that the entryway area in front of the MCAB is a traditional public forum. Defendants, meanwhile, argue that this area is a nonpublic forum.

A traditional public forum is "government property that has been traditionally open to the public for expressive activity." *United States v. Kokinda*, 497 U.S. 720, 727 (1990). For instance, locations such as streets and parks have been recognized as public forums, as they are open to the public and have traditionally been used for "communicating thoughts between citizens, and discussing public questions." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992) (quoting *Hague v. Comm. for Indus. Org.*, 307 U.S. 496,

515 (1988)). That an area is "open to the public" is nevertheless insufficient to establish it as a public forum. *Kokinda*, 497 U.S. at 729. The area must also be "dedicated to [ ] expressive activity." *Id.* at 730. The Ninth Circuit has created a three-factor balancing test to determine whether a public location is a traditional public forum:

> (1) the actual use and purposes of the property, particularly status as a public thoroughfare and availability of free public access to the area, (2) the area's physical characteristics, including its location and the existence of clear boundaries delimiting the area, and (3) traditional or historical use of both the property in question and other similar properties.

*Wright*, 665 F.3d at 1135 (quoting *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1100–01 (9th Cir. 2003)) (internal quotations omitted).

### 1.     Purposes of the Property

First, the Court must consider "the actual use and purposes of the property, particularly status as a public thoroughfare and availability of free public access to the area." *Id.* In the instant case, it is useful to consider the purposes of both the area in front of the doors and the building to which this area is connected.

### a.     The Area in Front of the MCAB

The area at issue is a modestly-sized entryway in front of the MCAB that is used by patrons to navigate between the parking lot and the building. (Doc. 87-1, Ex. L). Neither this concrete area nor any of the exterior walkways are connected to any public streets or sidewalks, and there are no benches, tables, or other such structures on or near the entrance which might encourage visitors to linger there. The Supreme Court held in *U.S. v. Kokinda* that a sidewalk "constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office" was not a public forum. 497 U.S. 720, 728 (1990). *See also Monterey County Democratic Cent. Committee v. U.S. Postal Service*, 812 F.2d 1194, 1197 (9th Cir. 1987) ("That a sidewalk is situated on publicly owned property without more, [ ] is insufficient to accord it public forum status."). The area at issue in this case, although wider than a sidewalk, is similarly limited in use and purpose. Such limited use and purpose weigh against the area being a public forum.

### b.      The MCAB

The MCAB has a variety of purposes. It houses the offices of the County's treasurer, recorder, and assessor, and is used by County residents to pay taxes and apply for licenses and permits. The building also regularly houses the meetings of two "legislative bod[ies]"—the Mohave County Board of Supervisors and the Mohave County Planning and Zoning Commission. (Doc. 105 at 2).The Board of Supervisors holds regular meetings in an auditorium in the MCAB at which it conducts official County business, and County residents may attend these meetings and voice their opinions about issues before the Board. (*See* Doc. 89-1, Ex. 3 at 1) ("If members of the public wish to address the Board regarding an item they may fill out the Request to Speak Form . . . located in the back of the room. The form should then be given to the Clerk of the Board prior to the meeting."). In short, the MCAB houses both administrative and legislative activities.

Where a government building houses legislative activities, courts have typically held that the building's grounds are a traditional public forum. *See, e.g., Lederman v. U.S.*, 291 F.3d 36, 44 (D.C. Cir. 2002) (sidewalk at foot of U.S. Capitol steps is a public forum); *Pouillon v. City of Owosso*, 206 F.3d 711, 713, 715–17 (6th Cir. 2000) (city hall steps are a traditional public forum); *Pinette v. Capitol Square Rev. & Advisory Bd.*, 30 F.3d 675, 678 (6th Cir. 1994) (ten-acre public square surrounding Ohio State Capitol is a public forum); *Chabad-Lubavitch of Ga. v. Harris*, 752 F. Supp. 1063, 1067–68 (N.D. Ga. 1990) (plaza in front of Georgia State Capitol is a public forum). These courts, however, have typically cited the grounds' history of being used for expressive activities. *See, e.g., Pinette*, 30 F.3d at 678 ("Capitol Square is, indeed, a traditional public forum. Over the years, groups . . . have held rallies and sponsored speeches in the square."); *Harris*, 752 F. Supp. at 1066 ("[T]he plaza, the parties agree, has been used repeatedly in demonstrations and rallies. Consequently . . . the plaza is a public forum."). As the Sixth Circuit explained in *Pouillon v. City of Owosso*, "[although] [n]umerous cases have held that the United States Capitol, as well as state capitols, are proper fora for demonstrations. . . . [i]n most of these cases, the [public forum] issue is decided by reference to the history of the building's use." 206 F.3d 711, 717 (6th Cir.

2000).

In sum, the mere fact that a building is used for legislative purposes, without more, is insufficient to render its entire grounds a public forum. Nonetheless, courts have implied that the legislative purpose of a building is a factor which should be taken into consideration when conducting a forum analysis. *See Lederman*, 291 F.3d at 42 ("[T]he primary purpose for which the Capitol was designed—legislating—is entirely consistent with the existence of all parades, assemblages, or processions which may take place on the grounds.") (internal citation and quotation marks omitted); *Jeannette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575, 584 (D. D.C. 1972) (["T]he fundamental function of a legislature in a democratic society assumes accessibility to [popular] opinion."). Accordingly, that legislative activities are conducted inside the building weighs in favor or the building being a public forum.

## 2.    The Area's Physical Characteristics

Second, the Court must weigh "the area's physical characteristics, including its location and the existence of clear boundaries delimiting the area." *Wright*, 665 F.3d at 1135 (internal citation and quotations omitted). "[A]reas that are centrally located and integrated into the surrounding locale provide no alteration of expectations that would justify nonpublic forum status." *City of Las Vegas*, 333 F.3d at 1102. In contrast, where an area is not integrated into surrounding public locales, any expectation that this area is open for expressive activities is weakened. For instance, the Seventh Circuit held that the sidewalks at Chicago's government-owned Navy Pier—which contains recreational and commercial facilities—are not traditional public forums because they "are not through routes; they lead only to the pier facilities themselves." *Chicago Acorn v. Metropolitan Pier and Exposition Authority*, 150 F.3d 695, 702 (7th Cir. 1998); *see also Citizens to End Animal Suffering and Exploitation, Inc. v. Faneuil Hall Marketplace, Inc.*, 745 F. Supp. 65, 70 (D. Mass. 1990) (finding it significant that "[m]any pedestrians wholly uninterested in the Marketplace's offerings cross its lanes daily in traveling to the waterfront"). The area at issue in this case is not centrally located or integrated into any surrounding public locale. It leads only to the

MCAB. (Doc. 87-1, Ex. L). Moreover, the area is not expansive and is located directly in front of the building. Accordingly, any expressive activities conducted thereon take place "near" or "in the immediate vicinity of" the MCAB. *Jeannette*, 342 F. Supp. at 584 (finding significant that "the [U.S.] Capitol Grounds . . . are so extensive that demonstrations which may take place upon them might not be 'near' or 'in the immediate vicinity of' the Capitol itself"). The "physical characteristics" factor weighs against the area being a traditional public forum.

To be sure, in *Lederman v. U.S.*, the D.C. Circuit held that a sidewalk near the East Front of the U.S. Capitol was a public forum, even though it was not integrated into the surrounding public locale. 291 F.3d 36, 44 (D.C. Cir. 2002) ("[T]he East Front sidewalk borders no public streets."). Nonetheless, that sidewalk "wrap[ped] around the Capitol's East Front almost without interruption, providing pedestrian access to the entire front of the building in addition to the doors, thereby facilitating tourist access to the Capitol." *Id.* at 44. The area at issue in this case, on the other hand, leads from the parking lot to the building's entrance. It more closely resembles the walkway at issue in *Monterey County Democratic Central Committee v. U.S. Postal Service*, which the Ninth Circuit held was not a public forum. 812 F.2d 1194 (9th Cir. 1987). Like the walkway in *Monterey County*, the entrance area in the instant case is "separated from the municipal sidewalks by the [building's] parking area. The isolated nature of the building . . . indicate[s] to all who approach that the walkway services [ ] patrons entering the building and that it is not a thoroughfare for passersby intent on other errands." *Id.* at 1197.

### 3. Traditional or Historical Use of Both the Property in Question and Other Similar Properties

Lastly, the Court must evaluate "the traditional or historical use of both the property in question and other similar properties." *Wright*, 665 F.3d at 1135 (quoting *City of Las Vegas*, 333 F.3d at 1100–01) (internal quotations omitted). In other words, the Court must examine the area's "historic use as a public forum and whether it is part of the class of property which, by history and tradition, has been treated as a public forum." *City of Las*

1   *Vegas*, 333 F.3d at 1103.

2                     **a.      Historical Use of the Pathway**

3       Defendants have adequately established that Mohave County has a longstanding

4   "policy" that County property "is not meant to be a public forum available to pamphleteers,

5   petitioners, and others engaging in protected free speech." (Doc. 87-1, Ex. J) (2007 letter

6   from Ekstrom to Walker and other County officials). Where the "historical use" analysis of

7   the area in front of the MCAB's is concerned, however, Defendants must not only show that

8   the County had this policy, but that it actually enforced the policy in the area at issue. In

9   other words, Defendants  must show that expressive activity on the area in front of the

10  MCAB has been "traditionally restricted." *Pouillon*, 206 F.3d at 717 ("[I]n the absence of

11  a showing that the steps of this public building have been traditionally restricted, we hold that

12  the steps . . . are a traditional public forum."). Where a governmental entity has historically

13  permitted expressive activities to occur in a given venue, it "may not by fiat assert broad

14  control over [such] speech or expressive activities." *Int'l Soc'y for Krishna Consciousness,*

15  *Inc. v. Lee*, 505 U.S. 672, 700 (1992) (Kennedy, J., concurring). *See also City of Las Vegas*,

16  333 F.3d at 1105 (9th Cir. 2003).

17      The Parties do not dispute that prior to the October 2010 incident where Plaintiff was

18  told to stop leafleting, he had on several occasions "handed out written material such as the

19  Declaration of Independence, information about different projects to be discussed by the

20  Mohave County Planning and Zoning Council and the Board of Supervisors, and information

21  about the Northwest Arizona Watershed Council" near the building's entrance, and that "no

22  county official had ever told [him] to stop." (Doc. 89, ¶¶ 39, 42) (Plaintiff's unopposed

23  statement of facts). Moreover, Supervisor Sockwell attests that he is not "aware of any action

24  taken by Mohave County to curtail . . . the passing out of literature" prior to November 2009.

25  And a Mr. Val Starr attests that prior to the enactment of AP 3-1 he had passed out literature

26  in front of the MCAB on several occasions and was never asked to stop. (Doc. 87-1, Ex. G

27  at 39) (stating that on one occasion his group was "approached by security who asked us not

28

1   to block the main entrance and stand to the side" but that he was never asked to stop

2   leafleting altogether).

3          Defendants, meanwhile, contend that it has always been their practice to stop

4   leafleting near the entrance. (Doc. 94 at 6). They provide the deposition testimony of County

5   Risk Manager Richard Weldon, who attests that "[e]very time someone is found to be

6   standing in front of the doors . . . passing out material, security calls one of my personnel,

7   and we respond to the location and stop that." (Doc. 87-1, Ex. A at 18). Weldon further

8   attests that he sees no difference between what he is doing to stop people under AP 3-1 and

9   what he did to stop people prior to the enactment of AP 3-1. (*Id.* at 22:12–16).

10         Defendants argue, citing *United States v. Gilbert*, 920 F.2d 878 (11th Cir. 1991), that

11  "isolated incident[s] of one citizen getting past the policy" do not create an issue of fact.

12  (Doc. 94 at 6). In *Gilbert*, the Eleventh Circuit held that the entryway to a federal courthouse

13  was a nonpublic forum because the plaintiff had produced "absolutely no evidence that the

14  government intentionally permits others, either by written or unwritten policy, to use the

15  [entryway] for demonstrations." 920 F.2d at 885. The court acknowledged that there was

16  some evidence in the record that the entryway had occasionally been used during protest

17  activity, but stated that "the most [plaintiff] has shown are isolated instances of undiscovered

18  violations." *Id.* In this case, on the other hand, Plaintiff has produced evidence of more than

19  undiscovered violations. For instance, as discussed, Mr. Starr attests that he leafleted in front

20  of the MCAB on several occasions prior to the enactment of AP 3-1. (Doc. 87-1, Ex. G at

21  39). He further attests that the building security was aware of and permitted this leafleting,

22  simply requesting that he stand to the side and not block the entrance. (*Id.*). In short, the

23  evidence creates a genuine issue of fact as to whether the County actually permitted

24  leafleting near the MCAB entrance.

25                      **b.    Historical Use of Other Similar Properties**

26         The Court must also weigh whether venues similar to the MCAB entryway have

27  historically been held to be public forums. *Wright*, 665 F.3d at 1135; *City of Las Vegas*, 333

28  F.3d at 1103. As discussed above, the MCAB does not fit neatly into either the state capitol

category of cases, in which courts have deemed large plazas near state capitol buildings to be public forums, nor into the post-office sidewalk category of cases, in which courts have deemed sidewalks leading from the parking lot to the front door of a post-office not to be public forums. The MCAB's entrance area is, however, similar to the venue in *Pouillon v. City of Owosso*, 206 F.3d 711 (6th Cir. 2000).

In *Pouillon*, the Sixth Circuit determined that the City of Owosso's city hall steps were a public forum. 206 F.3d at 717. The court's determination was based, in part, on the lack of evidence that the city had traditionally restricted expressive activities on the steps:

> [T]he record before us indicates that no one raised the question of how Owosso's city hall steps had been used in the past, whether made available to demonstrations or not. But in the absence of a showing that the steps of this public building have been traditionally restricted, we hold that the steps of Owosso's city hall are a traditional public forum.

*Id.* Like Owosso's city hall, the MCAB "is a venue that seems in the highest degree linked, traditionally, with the expression of opinion." *Id.* at 716–17. As discussed above, however, there is a genuine issue of fact as to whether expressive activity near the MCAB's entrance has been "traditionally restricted." *Id.*

### 4. Balancing of the Factors

While the physical characteristics of the area in front of the MCAB—namely its modest size and proximity to the entrance—weigh against it being a public forum, that the MCAB houses legislative activities weighs in favor of it being a public forum. Accordingly, the area's forum status hinges on a genuine issue of fact—whether the County has historically allowed this area to be used for expressive activities. As discussed below, however, the Court need not determine whether the area is a public or nonpublic forum: even if the entrance area is a nonpublic forum, the leafleting regulations as applied to Plaintiff are unconstitutional.

### E. Constitutionality of Leafleting Prohibition

In a nonpublic forum, speech restrictions must be "(1) reasonable in light of the purpose of the forum; and (2) viewpoint neutral." *Alpha Delta Chi-Delta Chapter v. Reed*,

648 F.3d 790, 798 (9th Cir. 2011). Plaintiff concedes that AP 3-1's leafleting prohibition is viewpoint neutral. He argues, however, that in light of the purposes of the forum, the restriction is unreasonable as applied to him.

"The 'reasonableness' requirement for restrictions on speech in a nonpublic forum 'requires more of a showing than does the traditional rational basis test; *i.e.,* it is not the same as establish[ing] that the regulation is rationally related to a legitimate governmental objective, as might be the case for the typical exercise of the government's police power.'" *Sammartano v. First Judicial Dist. Court, in & for County of Carson City*, 303 F.3d 959, 966–67 (9th Cir. 2002) (citing *Tucker v. State of California Dept. of Educ.,* 97 F.3d 1204, 1215 (9th Cir.1996)). "There must be evidence *in the record* to support a determination that the restriction is reasonable. That is, there must be evidence that the restriction reasonably fulfills a legitimate need." *Sammartano*, 303 F.3d at 967 (emphasis added and internal citation omitted).

AP 3-1 prohibits all "[l]eafleting or distribution of flyers or other literature." (Doc. 87-1, Ex. F at 2). Defendants argue that this total ban on leafleting is reasonable because it ensures that County taxpayers are not paying to clean up after leafleteers, supports the public perception of partisan neutrality, and prevents disruptions to the flow of traffic. (Doc. 86 at 12). Defendants have failed, however, to identify evidence in the record that the restriction, as applied to Plaintiff, "reasonably fulfills a legitimate need." *Sammartano*, 303 F.3d at 967.

First, Defendants have provided no evidence that Plaintiff's leafleting activities—or anyone else's leafleting activities for that matter—are likely to cause extra clean up for the County. Moreover, even if leafleting would create extra clean-up costs for the County, a mere increase in cleaning costs is not a reasonable grounds on which to restrict leafleting. *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (holding that the right to distribute literature cannot be withdrawn based on "the minor nuisance for a community of cleaning litter from its streets").

Nor does the record show that there is a risk of the public mistaking Plaintiff for a county representative or otherwise determining based on his behavior that the County is

partisan to Plaintiff's viewpoints. Reasonable persons are not likely to view private citizens leafleting outside the MCAB as being endorsed by the County. *Cf. Tucker v. State of Cal. Dept. of Educ.*, 97 F.3d 1204, 1215 (9th Cir. 1996) ("Reasonable persons are not likely to consider all of the information posted on bulletin boards or walls in government buildings to be government-sponsored or endorsed.). And "[c]ertainly a total ban on [leafleting] is an unreasonable means of obviating such a concern." *Id.*

Lastly, Defendants have not provided evidence that one or two leafleteers standing in the area Plaintiff stood would obstruct others' access to the building. Defendants' counsel conceded during oral argument that Plaintiff was not obstructing access to the building. In addition, Weldon conceded in his deposition that he had received no reports of Plaintiff being "disruptive" and that he did not see any disruptive behavior while observing Plaintiff's leafleting activities. (Doc. 87-1, Ex. A at 30) To be sure, the County has a legitimate need to maintain a clear walkway from the parking lot to the MCAB's front doors; and it "need not choose the least restrictive alternative" to fulfil this need. *Sammartano*, at 966–67. Nonetheless, the speech restrictions the County chooses must be "tailored to [its] legitimate concerns." *Id.* at 968. And a total ban on all leafleting anywhere on MCAB premises is not "tailored" to the County's alleged crowding concerns. *See id.* at 968–69 (holding that although a government complex "has a legitimate need to preserve an orderly and safe place to conduct the public's business," "a total ban on [a particular type of ] expressive activity, applying to a visitor to the volunteer services office or the office of the Advocate to End Domestic Violence and even to individuals who will do no more than walk in the Complex halls, is an unreasonable means of obviating the concerns articulated by [the defendants]"). "This is especially so given the far less restrictive alternative of [ ] rules or orders . . . limited to [specific areas or disruptive behaviors]." *Id.*

In sum, AP 3-1's sweeping ban on leafleting is unreasonable as applied to a person leafleting away from the front doors, and who does not attribute his views to the County or obstruct access to the building. The reasonableness determination is to be made "in the light of the purpose of the forum." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.,* 473 U.S.

788, 809 (1985). And as discussed, one of the key purposes of the MCAB is to house the County's legislative bodies. Given County residents' obvious interest and stake in County decisions, it is unreasonable to deprive those residents of the ability to leaflet anywhere on the MCAB premises without the County showing a legitimate need to do so, particularly where the broad scope of AP 3-1's other prohibitions has closed off virtually all alternative channels of communication. (*See* Doc. 87-1, Ex. F at 2).[5]

The Court will therefore grant Plaintiff's motion for partial summary judgment insofar as it pertains to AP 3-1's absolute prohibition on leafleting and declare this provision unconstitutional as applied to Plaintiff to the extent that he desires to distribute material while not impeding access to the MCAB or otherwise being disruptive. 28 U.S.C. § 2201 (2010) ("In a case of actual controversy within its jurisdiction, any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration."). *See also Foti v. City of Menlo Park*, 146 F.3d 629, 635 (9th Cir. 1998) ("An as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others. An as-applied challenge does not implicate the enforcement of the law against third parties. . . . A successful as-applied challenge does not render the law itself invalid but only the particular application of the law.") (internal citation omitted). As discussed, Plaintiff has not established standing to challenge AP 3-1's other allegedly unconstitutional provisions. The Court will therefore grant Defendants' motion for summary judgment with regard to these provisions.

**F.    Qualified Immunity**

Defendants contend that Ekstrom and Walker are entitled to qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages

---

[5]Although the County states without citing to the record that it "leaves open alternate forums for leafleting activity on public property nearby,"(Doc. 94 at 9), there are not any public sidewalks or other public forums in the immediate vicinity of the MCAB. (Doc. 105-1, Ex. A; Doc. 87-1, Ex. K).

1    insofar as their conduct does not violate clearly established statutory or constitutional rights

2    of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

3    (1982). Whether a reasonable government official should have known of a right in a

4    particular factual context depends on whether a principle of law had been "clearly established

5    at the time" the official took the contested action. *Pearson* v. *Callahan*, 555 U.S., 223, 244

6    (2009). "Even in the context of clearly established law, '[i]f the [official's] mistake as to

7    what the law requires is reasonable . . . the [official] is entitled to the immunity defense.'"

8    *Galvin v. Hay*, 374 F.3d 739, 745 (9th Cir. 2004) (citing *Saucier v. Katz*, 533 U.S. 194, 205

9    (2001)). Accordingly, "the qualified immunity defense . . . provides ample protection to all

10   but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475

11   U.S. 335, 341 (1986).

12   In the Ninth Circuit, a court looks first to Supreme Court precedent, and then to Ninth

13   Circuit caselaw to find whether a principle has been clearly established. If those sources are

14   not decisive, a court may turn to "whatever decisional law is available to ascertain whether

15   the law is clearly established." *Capoeman v. Reed*, 754 F.2d 1512, 1514 (9th Cir. 1985)

16   (considering out-of-circuit cases, including district court and state court cases from other

17   circuits, to conclude that a right was clearly established in the absence of Ninth Circuit

18   precedent).

19   Defendants contend that it "is not clearly established that Plaintiff had a right to hand

20   out leaflets at the County Administration Building," citing cases in which courts have upheld

21   restrictions on leafleting near a state fair, an abortion clinic, a power laboratory, and a

22   performing arts complex. *See Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S.

23   640, 647 (1981) (state fair); *Hill v. Colorado*, 530 U.S. 703, 715, 729–30 (2000) (abortion

24   clinic); *Knolls Action Project v. Knolls Atomic Power Laboratory*, 771 F.2d 46 (2d Cir.

25   1985) (power laboratory); *Hotel Emples. & Rest. Emples. Union, Local 100 v. City of N.Y.*

26   *Dep't of Parks & Rec.*, 311 F.3d 534, 554 (2d Cir. 2002) (performing arts complex). Plaintiff,

27   on the other hand, references caselaw in which courts have invalidated speech restrictions

28   in large plazas near legislative buildings, and argues that the instant case is "easily

distinguishable" from the cases referenced by Defendants, which involve non-legislative forums. (Doc. 91 at 12). Unlike the legislative buildings referenced by Plaintiff, however, the MCAB does not have a large plaza on its premises; rather, the area in front of the building where the County enforced the leafleting provision is modest and connects to a pathway that leads from the building to the parking lot. As discussed above, the Supreme Court held in *Kokinda* that the government could prohibit solicitation on a sidewalk "constructed solely to assist postal patrons to negotiate the space between the parking lot and the front door of the post office." 497 U.S. at 728. A reasonable County official could therefore have concluded that broad leafleting restrictions near the entrance area to the MCAB were valid. Ekstrom and Walker are entitled to qualified immunity and will be dismissed from this lawsuit in their individual capacities.

### G. Punitive Damages

In his Amended Complaint, Plaintiff requests punitive damages against Defendants Ekstrom, Sockwell, and Walker. "Punitive damages are available against individual [government officials] in a § 1983 claim only where the [officials'] 'conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *Dubner v. City and County of San Francisco*, 266 F.3d 959, 969 (9th Cir. 2001) (citing *Smith v. Wade*, 461 U.S. 30, 56 (1983)). As discussed above, Ekstrom, Sockwell, and Walker are dismissed from this action in their individual capacities. Plaintiff is therefore precluded from seeking punitive damages against them. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981) (holding that punitive damages are not recoverable against a state official sued in his or her official capacity).

Moreover, even if Ekstrom, Sockwell, or Walker were liable in their individual capacity, Plaintiff would not be entitled to punitive damages. Plaintiff contends, without citing to the record, that punitive damages are appropriate against Walker because he has "expressed animosity toward [Plaintiff's] speech activities." (Doc. 91). Although Walker has publically voiced his strong opinion that members of the WSCA have no right to engage in "partisan politics" on County property, (Doc. 92-1 at 53), Plaintiff has not produced evidence

1    by which a reasonable fact finder could determine that Walker's opinion rose to the level of

2    "evil [ ] intent" or "reckless or callous indifference" to Plaintiff's rights. *Dubner*, 266 F.3d

3    at 969. Nor has Plaintiff demonstrated that Ekstrom or Sockwell were so motivated.

4    Accordingly, there is "insufficient evidence to support an allegation as to punitive damages."

5    *Id.*

6                                    **CONCLUSION**

7            Plaintiff concedes that Defendant Smith is entitled to summary judgment. Moreover,

8    Plaintiff has not shown a genuine issue of fact that Defendants Johnson, Sockwell, or Watson

9    implemented or were the moving force behind AP 3-1. That Defendant Walker's alleged

10   unconstitutional actions were taken in his capacity as County Manager does not render him

11   immune to claims against him in his individual capacity.

12          There is no evidence in the record that AP 3-1's absolute leafleting prohibition is

13   tailored to a legitimate County need. It is therefore unreasonable and, as applied to Plaintiff,

14   violates the First Amendment. Plaintiff does not have standing to challenge the other

15   allegedly unconstitutional provisions. Defendants Ekstrom and Walker are entitled to

16   qualified immunity and will not be liable for any punitive damages.

17          **IT IS THEREFORE ORDERED THAT:**

18          1.      Defendants' Motion for Summary Judgment (Doc. 86) is **granted in part and**

19   **denied in part.**

20          2.      Plaintiff's Motion for Partial Summary Judgment (Doc. 88) is **granted in part**

21   **and denied in part.**

22   / / /

23   / / /

24   / / /

25

26

27

28

                                        - 22 -

1    3.    The following provision in AP 3-1 is hereby declared unconstitutional as it

2  applies to Plaintiff's nonobstructive distribution of leaflets around the MCAB: "Leafleting

3  or distribution of flyers or other literature."

4    4.    Because this Order resolves all Plaintiff's claims against all parties, the Clerk

5  of Court is directed to **terminate** this action.

6    **DATED this 6th day of September, 2012.**

7

8    _A. Murray Snow_

9    G. Murray Snow
     United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28